## SUPREME COURT — APPELLATE DIVISION — FIRST DEPARTMENT.

### January 14, 1921.

## THE PEOPLE v. JULIUS HAMMER.

(194 App. Div. 712.)

(1) ABORTION*—MANSLAUGHTER, FIRST DEGREE—EVIDENCE ESTABLISHING PRIMA FACIE.

The defendant was indicted and convicted of a crime of manslaughter in the first degree for causing the death of a woman by committing an abortion upon her which was not necessary to preserve her life. *Held,* that when the People rested their case they not only had established a *prima facie* case against the defendant but had also assumed the unnecessary burden of showing that the operation performed upon the deceased woman was not essential to preserve her life, though that burden was really upon the defendant.

(2) SAME—ANSWER TO HYPOTHETICAL QUESTION.

It was not error to refuse to strike out the words "following an abortion" in the answer of a physician to a hypothetical question wherein he stated that the cause of death was "Acute suppurative peritonitis following necrotic endometritis following an abortion," for the answer fairly embodies a medical opinion upon the assumed facts, and furthermore it was conceded that death was due to peritonitis following an abortion.

(3) SAME—REFUSAL TO CHARGE AS TO DIRECT EVIDENCE OF DEFENDANTS AT TIME OF OPERATION AND AS TO EVIDENCE BY DEFENDANT'S ASSOCIATE.

It was not error to refuse to charge, at defendant's request, that "In this case there is no direct evidence save that of the defendant as to what the defendant's intention was at the time he performed the curettage," for there were many circumstances in evidence which bore strongly upon the intention of the defendant to commit the crime charged and which the jury properly might consider in finding intent.

(4) SAME.

It was not error for the court to refuse to charge, at defendant's request, that if they believed that the occurrence on the day when the alleged abortion took place was as recited by defendant's associate, it was their duty to acquit, since the defendant's associate was not in the defendant's office at the time of the operation and if said associate's

* See note, Vol. 22, 177.

testimony was entirely correct the jury nevertheless may have believed that the defendant staged the situation in order to protect himself from any serious consequences which might flow from his act. And, moreover, there was abundant evidence and there were many circumstances established which would permit the jury to find the defendant guilty.

(5) SAME—NEWSPAPER STATEMENT OF OFFER OF BRIBE TO JUROR.

The examination of one of the jurors, not in the presence of the other jurors, as to his connection with a bribe which a newspaper stated had been offered on behalf of the defendant, and the subsequent reading of the examination to the other jurors and the examination in open court of each juror individually as to whether he would render a fair and impartial verdict in the case and would absolutely disregard any outside considerations, was not prejudicial to the defendant, since the procedure followed was outlined by the defendant's counsel and acquiesced in by him.

APPEAL by the defendant, Julius Hammer, from a judgment of the County Court of the county of Bronx, rendered on the 26th day of June, 1920, convicting him of the crime of manslaughter in the first degree, and also from an order, entered in the office of the clerk of the county of Bronx on the 19th day of July, 1920, denying defendant's motion for a new trial made upon the minutes.

*Francis M. Scott* of counsel (*Scott, Gerard & Bowers,* attorneys), for the appellant.

*Francis Martin* of counsel (*Charles B. McLaughlin, Albert Cohn* and *William F. Quigley* with him on the brief; *Francis Martin, District Attorney*), for the respondent.

GREENBAUM, J.:

The crime for which the appellant was indicted and convicted is defined in section 1050 of the Penal Law as follows: "A person who provides, supplies, or administers to a woman, whether pregnant or not, or who prescribes for, or advises or procures a woman to take any medicine, drug, or substance, or who uses or employs, or causes to be used or employed,

any instrument or other means, with intent thereby to procure the miscarriage of a woman, unless the same is necessary to preserve her life, in case the death of the woman, or of any quick child of which she is pregnant, is thereby produced, is guilty of manslaughter in the first degree." It is urged in behalf of the appellant that the conviction was contrary to the evidence and the weight of the evidence and that there were serious legal errors during the course of the trial which justify a reversal of the judgment.

The indictment charged that on July 5, 1919, Julius Hammer, the defendant, did feloniously cause the death of one Marie Oganesoff, a woman who was then pregnant by thrusting into her womb with intent to commit an abortion certain instruments which resulted in her death on July 11, 1919. The defendant is a physician having an office in the county of Bronx and a graduate of the College of Physicians and Surgeons in 1902.

When the People first rested they not only had established a *prima facie* case against the defendant but they had also assumed the unnecessary burden of showing that the operation performed upon the deceased woman was not essential to preserve life. That burden was really upon the defendant. It was so held in Bradford v. People (20 Hun, 309) and Fleming v. People (27 N. Y. 329). The defense was that the operation was necessary to preserve life; that the peritonitis which resulted in the woman's death did not result from the operation performed by the defendant, but was due to the use of a crochet needle by the deceased upon herself for the purpose of bringing on an abortion. The defense also contended that Mrs. Oganesoff had for years been suffering from a diseased heart and a diseased physical condition which would make a complete pregnancy dangerous to her life. It was admitted by the defendant that he performed the operation of curettage and that such an operation would in a case of a pregnant woman bring on a miscarriage. The case thus nar-

rowed itself down to this: Was the patient when she came to the doctor's office on July 5, 1919, in such a physical condition that he honestly believed that in order to preserve her life it was necessary to procure her miscarriage if she was pregnant? The defense presents two aspects: (1) That death resulted from the use of a crochet needle by the deceased, and (2) that regardless of whether it did or not, the defendant honestly believed that the physical condition of the patient was such that it was necessary to perform the operation of curettage in order to preserve her life. The acting deputy chief medical examiner of the city of New York, who performed the autopsy on the body of Marie Oganesoff, testified that he found that she had been pregnant for about a month prior to the time of her death; that he reached this conclusion from the fact that he found that she had an enlarged ovary; enlarged sinuses, *i. e.,* blood vessels of the uterus; that the circumference of the internal opening of the uterus was enlarged as was also the uterus; all of which were indications of pregnancy and finally that there was evidence that a foetus had been expelled from the womb; that all of the vital organs of the body were normal excepting such portions thereof as showed degeneration due to sepsis or blood poisoning following infection and that the autopsy disclosed no indication of the existence of influenza in any part of the body, a circumstance which it will hereafter appear is of importance.

The maid of the deceased testified that she accompanied her mistress to the defendant's office on the morning of July fifth; that she then appeared to be well and required no assistance; that when Mrs. Oganesoff left the doctor's office she was pale and weak; that she had to be assisted downstairs and into her automobile; that she walked very slowly and directed her chauffeur to drive the car very slowly; that the maid immediately upon her return home assisted in putting her mistress to bed and that she then saw bright red spots of blood on her drawers between the legs. The chauffeur corroborated the

maid as to the appearance of Mrs. Oganesoff before she reached the defendant's office and after she left there and as to her difficulty in walking after leaving defendant's office and as to her instructions to be driven home slowly.

The husband of the deceased testified that on July fourth, Friday, he, his wife and their son, a lad of fourteen years of age, were the guests of a friend at his home on East Fifty-seventh street where they stayed from eleven A. M. to about seven P. M., after which they returned to their own apartments; that he himself attended a dinner party that night with some friends in the country, but that his wife remained at home; that when he left the house on the morning of July fifth (Saturday), his wife was about as usual and that when he returned in the afternoon between four and five o'clock he found her lying in bed; that on the following morning (Sunday) after a talk with his wife he called up the defendant's office on the telephone but did not reach him and that he got into telephonic communication with him during the afternoon and told him that his wife was in a bad condition and that she had a high temperature; that Dr. Hammer reached his apartment on that day between six and eight o'clock in the evening and after making an examination of Mrs. Oganesoff's mouth he said "she has grippe and maybe flu;" that the witness anxiously inquired about his wife's condition and that the defendant answered that it was nothing dangerous, that it was a "little operation" that he had performed; that the next visit of the defendant was on Monday and the next on Tuesday when he made an internal examination of his wife; that the defendant stated that there was nothing dangerous and that he thought his wife was getting better; that upon being asked whether it would not be well to call in another doctor, defendant replied, "it is nothing dangerous, * * * we can see tomorrow. I can bring my friend doctor;" that he talked to the doctor about getting a nurse to which the doctor replied, "very sorry, now it is very difficult to get, but when I can get

my nurse which was nurse to my boy I bring with me;" that on Wednesday night the witness called in another doctor without consulting the defendant; that that doctor immediately procured two nurses; that when the defendant learned that another doctor had been called into the case he said: "Don't tell him (referring to the new doctor) that I make a little operation;" that on Friday morning, the day after his wife died, but before she was dead, the defendant requested him to let him write out her death certificate.

The doctor who had been called in by Mr. Oganesoff testified that he found that she had a temperature which indicated symptoms of peritonitis; that he had a talk with Dr. Hammer over the telephone and told him that she showed signs of peritonitis whereupon the defendant replied that Mrs. Oganesoff had had influenza for the last six days and the grippe and a sore throat; that he found no evidence of influenza, grippe or sore throat and so stated to the defendant; that on Friday morning when it became apparent that the patient would die from peritonitis, Dr. Hammer still persisted that it was a case of influenza and sore throat; that he had been treating her for influenza and the grippe; and that shortly before the patient died the defendant asked the witness to permit him (defendant) to write out the death certificate "on account of his having treated her for influenza;" that up to that time he had not been told by the defendant that the operation of curettage had been performed upon Mrs. Oganesoff. The two consulting physicians of high standing who had been called in by the new doctor verified the diagnosis that the patient had peritonitis and they so testified upon the trial.

After the People rested the defendant was called and testified that sometime during the day of July fourth the deceased phoned to him and insisted that she must see him as it was urgent; that he made an appointment with her at his office; that he endeavored to ward off the appointment because he was then living in the country in Edgemere where he wanted

to spend the day; that he finally consented to meet her at his office on Saturday, July 5, 1919; that she reached his office at about ten o'clock in the morning; that she then repeated many of the statements which she had made to him on a previous occasion in July, 1918, when he had curetted her; that she told him "that at this time she felt worse than she ever felt; * * * she was nine days overdue, but she was miserably sick for the last two weeks, that she could stand it no longer and she tried to bring it on as it was usual for her to do; sometimes she succeeded and sometimes she did not, and when she did not, she had to resort to physicians; this time it appeared to her that she did not succeed because the bleeding was not of the right kind; it wasn't a menstrual flow; it was bright red blood and it didn't relieve her; she vomited and couldn't stand any food; * * * that she had headache and she was in a very miserable condition; she was a highstrung, nervous, cultured woman that would suffer more keenly than an ordinary woman who is not a highstrung, nervous woman; she told me she could not rest; she could not sleep; she could do nothing; that she was in perpetual misery, and knowing that I might want to delay, or might want to refuse her, she made this appointment begging me, insisting that she will not go from the office until I relieve her from her condition;" that she said: "You know I can't give birth to a child; I am not poor." He further testified that "she said 'There is no use persuading me to leave it go; you know my history; you know I cannot leave it go; it is a question, you are going to relieve me or keep me in misery a few weeks, and then I will have to have it done anyway.' I told her this was a time I expected to join my family, and I didn't want to do it; I wanted her to go home or possibly she should go to a hospital; she said 'doctor you just told me'—she explained to me how she tried to bring it on; that she used a crochet needle, and she said she cleaned it very well; * * * she said she used peroxide on it, and told her 'my dear woman, don't you realize

that ever so clean as the needle may be in your mind, * * * from a surgical point of view it is not clean, and even if it were sterile, your parts are not sterile; your vagina may contain germs; when you bring an instrument into your uterus you are taking a chance on infection.' She said 'well then, how can you then talk to me about postponing the case, when you said to me yourself I might have infected myself, and in such a case every hour may count.' I was in a quandary. I felt that I didn't care for this job; I didn't want that job, but I called in Dr. Diamond."

It should here be noted that Dr. Diamond was a young physician of about eighteen months' experience who was an office associate of the defendant and who lived with defendant's family. Defendant said that he told Dr. Diamond: "This is the history of the case as I have known the woman; this is what she tells me now. I explained to him everything while I was scrubbing out my hands for an examination. Then I had her answer Dr. Diamond my questions as to what happened to her in her previous history, and what happened to her to get what we call recent history, present history, and she repeated the story to Dr. Diamond." The defendant then said that he put on sterile gloves and examined the patient and that after the examination he found blood on his two examining fingers which he showed to Dr. Diamond and then asked him, "What would you do under these circumstances?" that Dr. Diamond replied, " 'well, she may be infected and she may have trouble, in spite of the curettage, but she would have a better chance if you curetted her right then and there,' which I determined upon to do, and I curetted her then and swabbed out the uterus."

Defendant also testified that there were blood stains on her drawers and on her sanitary napkin and that his two examining fingers brought out thick blood which was not like a menstrual fluid; that it was impossible for him to determine whether she was or was not pregnant; that he had to take her word for it, although it was true the womb was larger than

normal, but that he remembered on a previous occasion, her womb was large, and it is possible to have a womb somewhat larger than normal, which does not indicate pregnancy, and that as a result of the curettage there came from the womb "just a little mucous membrane;" that when he performed the operation of curetting, she was put upon the operating table in his office, but that her clothing was not removed and that he used a bivalve speculum and a curet; that the patient complained of a mild sore throat and that he advised her to use a gargle, to which she answered she had some gargles at home; that she said that she had often been told by doctors both abroad and in this country that her heart and kidneys were in such a condition that she was not able to bear children and that at the time when the operation was performed neither Dr. Diamond nor any nurse was present. Dr. Diamond testified in substance that he was invited to come into the office of Dr. Hammer as he wanted his opinion about the case; that when he entered the office he was introduced to the patient, who was then lying on the examining table draped and ready for examination; that he was briefly told the history of the case; that the patient complained that she had been bleeding since the day before and that she was nine days overdue. He also gave testimony as follows: "Q. Were any questions asked of Mrs. Oganesoff? A. Yes, sir. Q. And what questions were asked? A. The patient was asked how the bleeding had commenced. Q. And was this in Russian? A. Partly Russian and partly in English. Q. And you could understand? A. Yes, sir. Q. And what did she say? A. She said that the bleeding had been brought on by herself, by the introduction of the crochet needle into the uterus. Q. Did Dr. Hammer question her at all in your presence with regard to the experience she had previously? A. Yes, sir. Q. What do you recollect about that, in substance? What was asked of the lady, and what did she say? A. The patient said that some six or eight years ago, in Europe, when she was about the third

or fourth month of pregnancy, she had become very ill, dangerously ill, as she expressed it, and so sick that she had to be removed to a hospital and that the doctors had told her that she was suffering from kidney trouble and had heart trouble, and that her pregnancy would have to be *terminated* if her life is to be saved and her pregnancy was terminated at that time. They also told her there that she must never become pregnant again, because pregnancy would endanger her life. Q. And did she say anything about other experiences since that time, down to the time that she came to Dr. Hammer's office? A. Yes, sir. Q. Now, what did she say about that, and was it in response to questions? A. Yes, sir. Q. Proceed, Doctor. A. She said that on numerous occasions since that time she had had abortions performed upon her. It was either following an attempt made by herself to bring it on, or else doctors had done it of their own accord. Q. Of their own acts? A. That they had initiated it. Q. She was an intelligent woman, was she not, doctor? A. Yes, sir. Q. A cultured woman? A. Yes, sir. Q. Now, did you see Dr. Hammer make an examination of her? A. Yes, sir. Q. Just state what you saw done, and what you observed? A. Why, when I came into the room Dr. Hammer soon thereafter began to scrub up his hands at the wash basin, and then he washed the patient, prepared the vulva, and after that he washed it with soap and water, and lysol solution, and then put on a pair of sterile gloves and examined the patient. Q. Did you see the condition of her underclothing at this time, before he inserted his fingers? A. Yes, sir. Q. And what did you notice? A. There was blood on it. Q. And did you see the doctor insert his fingers? A. Yes, sir. Q. And did you see him withdraw them? A. Yes, sir. Q. What did you see? A. There was blood on his fingers when he withdrew them."

On cross-examination he testified that he examined her heart with a stethoscope. He was also asked why he examined the heart and said: "First of all, for a complete examination; and,

secondly, for the question of an anæsthetic." The evidence was that no anæsthetic was administered. He was asked whether he made an examination of the patient's urine, to which he answered, "No," and he also testified that he made no examination of her kidneys, or of her throat. He was asked: "Did she give you any symptoms that might lead you to believe she had grippe? A. Yes, sir. Q. What did she say? A. She had had headache. Q. And what else? A. And she hadn't been feeling well, in general."

He further testified that the patient was on the operating table during all the time he was in the room and when asked whether he was then of the opinion that the crochet needle might have produced an infection and whether for that reason he advised the curetting, he answered in the affirmative. He also testified that he believed that infection might lead to sepsis (blood poisoning) and probably to death. Notwithstanding this opinion it does not appear that her temperature was taken or that aside from an examination of her heart any examination was made of her general physical condition.

The testimony of a number of physicians was given in behalf of the defendant. Two of these physicians had treated Mrs. Oganesoff in connection with previous pregnancies. One of them testified that in July, 1917, he found her in a condition which indicated that she was in the second or third month of pregnancy; that he examined the patient and he found her heart diseased; that she had told him that she had been advised by European physicians that she could not bear any more children and that she had been curetted several times; but that he did not operate because he was satisfied that a miscarriage was already going on. Another physician testified that he treated her in January, 1918, and that she also gave him her history similar to that which she stated to the defendant and that she exhibited symptoms which indicated a diseased condition of the uterus and that she was apprehensive lest she might be pregnant and that not being able to deter-

mine whether she was pregnant or not, he nevertheless deemed her condition such as to require curettage and accordingly performed it.    Two other physicians were called who gave expert testimony based upon hypothetical questions embodying the evidence given on behalf of the defendant, as to the propriety and correctness of the defendant's practice in curetting Mrs. Oganesoff.    Cross-examination of two of these witnesses showed that they always performed curettage in the hospital or in the patient's home with hospital surroundings and kept the patient in bed for twenty-four hours thereafter. One of them testified that he never curetted a person in her street clothing or without a nurse or assistant present.    The physicians were in practical accord that in case of infection of the womb high fever usually sets in within twenty-four to seventy-two hours after infection and there was also testimony that this sometimes happens within eighteen hours thereafter.

One of the vital questions in the case being whether the deceased died as a result of the use of the crochet needle or from the curettage operation performed by the defendant, it was strenuously argued in behalf of the defendant that the first indication that Mrs. Oganesoff had high temperature was about two hours after she had left the defendant's office on July fifth, and hence that the peritonitis and consequent death resulted from the infected crochet needle and not from the curet.

A careful examination of the testimony in that regard, however, fails to substantiate defendant's contention.    The defendant's brief in support of the claim that the evidence established that fever was present within two hours of the curettage, refers to the testimony of Mr. Oganesoff, of the new doctor who had been called in by Mr. Oganesoff and of the defendant.

Mr. Oganesoff's testimony touching upon the matter of temperature was to the effect that when he talked with Dr. Hammer over the telephone on Sunday, July sixth, at about noon, he then told him "that my wife is in bad condition, and she

has high temperature." But that was about twenty-five hours after the operation had been performed and besides there was no evidence whether Mr. Oganesoff had then taken the temperature of his wife, or merely inferred that there was high temperature from appearances. The testimony on that point by the doctor who had been called in was as follows: "Q. Were you told by the husband what time in the day fever was noticed in this patient? A. Yes, I believe he told me that she started to complain of a headache in the afternoon, the same day she came from the doctor. Q. Afternoon of Saturday, July fifth? A. I don't know what date; he told me the day she came from the doctor. Q. Did he tell you that it was within two hours after coming from the doctor? A. Something like that. Q. That is your best recollection, is it? A. That is the best."

This testimony merely indicates that she had complained of headache in the afternoon from which the doctor may have inferred that there was high fever. As matter of fact the testimony of the maid and the husband was that Mrs. Oganesoff had *complained of headache* for a number of days before the operation. Besides, the testimony of the husband was that he did not see his wife on July fifth, after he had left the house in the morning, until about four or five o'clock, which would be about five or six hours after the operation. As to the testimony of the defendant upon that subject it is as follows: "Q. Did he (referring to Mr. Oganesoff) tell you when she commenced to feel any pains after being at your office, and did he tell you anything about her having any temperature and fever? A. Yes, he told me she had 103; he had a thermometer and took her temperature; she had 103; I believe he told me, in Russian measurements; I believe his thermometer was Russian; it was equivalent to 103 and that she told him that her pain commenced shortly after she got home. Q. Shortly after she got home? A. Yes. Q. When then, doctor, when did you see her? A. I saw her about six o'clock that day. Q. And what did you then do, and what did you find?

A. Well, I took her pulse, her temperature, respiration, and saw that she had a rapid weak irregular pulse; her temperature was 103."

There is nothing indicated in the foregoing testimony as to when the husband told the defendant he found his wife had a temperature of 103. The defendant merely states that Mr. Oganesoff told him that his wife's "pain commenced shortly after she got home," which is quite different from saying that at that time she had a temperature of 103. Moreover, the defendant's testimony does not indicate whether he was told about the thermometer reading during his telephone talk with Mr. Oganesoff or when he called at the house on July fifth, at about six P. M.

The evidence established that under certain conditions curettage of a pregnant woman is entirely legitimate and that as matter of fact it is not infrequently performed by reputable physicians. The undisputed medical testimony was that where the patient was pregnant and there was no bleeding, curettage would be resorted to only for the purpose of bringing on a miscarriage, which in the language of the leading expert called by the defendant "would not be proper unless there were very special reasons for it, which should be substantiated by more than one opinion."

The Penal Law of the state forbids the use of any means, with intent thereby to procure the miscarriage of a woman, "unless the same is necessary to preserve her life." There were thus vital questions of fact which it was the province of the jury to determine upon the conflicting evidence, such as whether a crochet needle had been used by her before she came to the defendant, whether she was bleeding when she first saw him, or whether other special reasons existed justifying the honest conviction of the defendant that curettage was necessary to preserve the life of his patient.

In reaching a conclusion as to what the actual facts were it was the province of the jury to take into consideration all

the circumstances established by the evidence such as, for example, that the operation was performed without the presence of a nurse or another physician; that he did not take the temperature of the patient before he operated upon her to ascertain whether any fever had set in by reason of the alleged use of the crochet needle, in view of the medical opinions that fever often appears within twenty-four hours after infection; that he did not tell the patient after the operation that it was important to watch her temperature and advise him if any high temperature did set in; that he did not testify that he had inquired as to the time when the crochet needle had been applied by her; that he omitted to make any such examination of the patient as would ordinarily be expected of a physician to verify her statements as to her previous history and to ascertain for himself whether the curetting was necessary to save her life. The jury may also have considered and they would have been justified in so considering his subsequent failure to call in another doctor when so requested by the husband or to have a nurse in attendance upon the patient when her condition became serious and whether his reason that it was difficult to secure a nurse was a truthful one, particularly so when the new doctor who had been called in promptly procured two nurses and deemed it important to summon two eminent physicians for consultation. The jury also had a right to consider that the defendant although he had been practically ousted from the case, nevertheless called every day at the Oganesoff house but did not tell either of the new physicians that he had curetted the patient. They may have taken into consideration that defendant asked Mr. Oganesoff as well as the new doctor while the patient was in a dying condition, that he be permitted to write out the death certificate, and that he desired to state therein as a cause of death that the deceased had been suffering from an attack of influenza or grippe, when as matter of fact the testimony justified a finding that he did not treat the patient for influenza or grippe, and that she was

not suffering from any such disorder when the doctor performed the operation.

The legal errors which the defendant claims were committed upon the trial will be now considered *seriatim*. Towards the close of the People's case a hypothetical question was put to Dr. Schwartz, which embodied a resume of the evidence of the prosecution up to that time. The concluding portion of. that question was: "Assuming all the facts I have given you in the hypothetical question previously given, and taking into consideration what you found when you performed your autopsy, and to which facts you have already testified in this case, can you state an opinion with reasonable certainty as to what was the cause of death? * * * A. Yes, sir. Q. Will you state what the cause of death was? * * * A. Acute suppurative peritonitis following necrotic endometritis following an abortion."

These questions were objected to. The objections were overruled and exceptions duly taken. Counsel for the defendant moved to strike out the final words "following an abortion," which was denied and to which the defendant duly excepted. It seems to me the answer fairly embodies a medical opinion upon the assumed facts. Besides after both sides rested, the defendant admitted that he had curetted his patient and it was not disputed that she died of peritonitis resulting from infection brought into the uterus from the outside, so that upon the conceded facts the cause of her death was peritonitis "following an abortion" as Dr. Schwartz testified.

The next alleged error which the appellant urges was the court's refusal to charge the fifteenth request as follows: "15. In this case there is no direct evidence save that of the defendant as to what the defendant's intention was at the time he performed the curettage on Mrs. Oganesoff."

The appellant relies upon People v. Van Zile (143 N. Y. 368, 9 N. Y. Crim. 330) in support of his contention. That case to my mind has not the slightest bearing upon the error

assigned. In that case the court held that whether the jury believed or disbelieved the defendant's narration there was no evidence in the case of what was done at the time it was claimed that the criminal operation was performed.

In the instant case there were many circumstances, some of which have been mentioned, which bore strongly upon the intention of the defendant to commit the crime charged and which the jury properly might consider in finding intent. The appellant also claims error in the court's refusal to charge the following request: "I ask your Honor to charge the jury that if they believe that the occurrences on the 5th day of July was as recited by Dr. Diamond, that it is their duty to acquit." Dr. Diamond was not in the defendant's office at the time Mrs. Oganesoff was operated upon. He was called in after the doctor and his patient had held a conversation. If it be assumed that Diamond's testimony was entirely correct the jury nevertheless may have believed that the defendant staged the situation in order to protect himself from any serious consequences which might flow from his act. Moreover, there was abundant evidence and there were many circumstances established which would permit the jury to find the defendant guilty.

The appellant also relies upon an incident which occurred upon the trial as highly prejudicial to defendant which will now be adverted to. It appears that on June 24, 1920, while the trial was in progress there were sensational articles published in a number of New York's leading papers to the effect that one of the jurors had been offered a bribe of $10,000 to influence the verdict in favor of the defendant. That fact was promptly reported by the juror to the presiding judge who at once summoned counsel on both sides as well as the defendant to his chambers. The juror was there questioned both by the court and the counsel for the defendant and after the examination had been concluded, the learned counsel for the defendant stated before all the parties, "I must say, Mr.

Maher (referring to the juror), you have cleared the atmosphere wonderfully. I think, your Honor, that if this examination is read to the other jurors, I don't think I will make a motion. (The Court) I don't exactly understand what you mean. (Defendant's Counsel) Well, I will tell you. You can see, of course, that the impression it had made upon me as counsel—it is hardly human nature for jurors not to believe that an offer that has been made did not come in some indirect way from the defendant. If Mr. Maher's opinion, as he expressed it here, can be conveyed to the other jurors, why then much, if not everything, would have been done to avoid the prejudice that I have been apprehensive he has been laboring under. In other words, the prejudice that this article that they have read this morning in the *World,* unexplained in this way, naturally would lead the jurors to believe that if such an offer were made, and it is not explained, even though the court has not heard any evidence to the contrary, it must in some way be traceable to the defendant, but with this explanation in regard to some similar case, and your Honor stating that in any investigation that you have been able to make, you find no direct or indirect connection, I think much has been accomplished to enable your Honor to exercise discretion to go on with the case."

The parties then appeared in open court and the learned counsel for the defendant repeated substantially what he said to the judge in his chambers, adding that, "I feel now that this defendant is sure of having a fair trial." He also stated: "Your Honor very intelligently and with the greatest fairness has given time to have this matter thoroughly thrashed out, and it has resulted, I may say, speaking on behalf of my client, my associates and myself, with the greatest satisfaction, we found that when a matter can be thoroughly thrashed out in the fair way in which your Honor had this done, that we feel convinced that the rights of our client have been preserved."

Further on counsel said: "He has convinced me that it is

not only possible but that it is positive that so far as he is concerned his mind is as open at the present time with respect to the innocence or guilt of this defendant as it was when he took his oath of office as a juror. And, therefore, if your Honor will permit the proceedings which were had in your Honor's chambers to be made public to all of the jurors, and then if your Honor will interrogate them and ask them if they feel the same absolutely as Mr. Maher expressed himself, I am content to proceed."

The proceedings in the judge's chambers were then read to the jury and each juror was individually examined in open court and each one said separately that he would render a fair and impartial verdict in the case and would absolutely disregard any outside consideration. Counsel concluded by stating: "I think we have covered the situation and I shall make no further application."

It seems to me that under the circumstances the defendant is not in a position to claim that he was in any wise prejudiced by the incidents above narrated. Our conclusion in that respect is justified by a number of cases that have passed upon somewhat analogous situations. (People v. Wolter, 203 N. Y. 484, 26 N. Y. Crim. 519; Balbo v. People, 80 id. 484; People ex rel. Phelps v. Oyer & Terminer County of N. Y., 83 id. 436; People v. Willson, 109 id. 345, 351; People v. Lubin, 190 App. Div. 339; affd., 229 N. Y. 601, without opinion.)

It is only necessary to add that a reading of the record of the trial shows that the presiding judge afforded every opportunity to the defendant to present his defense and that the defendant had a fair and impartial trial. There seems to be no alternative but to affirm the judgment.

CLARKE, P. J., LAUGHLIN, DOWLING and MERRELL, JJ., concur.

Judgment affirmed.